# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00237-CV

**Tonya Garner, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. FM500277, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After a jury trial, the jury returned a verdict finding that appellant Tonya Garner's parental rights to her children should be terminated. The trial court entered a final decree of termination in accordance with the jury's verdict. On appeal, Garner contends that the evidence is legally insufficient to support the trial court's termination of her parental rights and that the court erred when it refused to submit a jury question regarding the appointment of her mother as managing conservator of the children. We affirm the trial court's decree of termination.

### Factual Summary

Garner has four children, Qy., a son born in May 1998, Qa., a daughter born in August 1999, T.S., a daughter born in January 2001, and Qn., a son born in March 2002. At the time of trial, Garner was incarcerated. The Department and the Austin Police Department first became involved with Garner and her children in 2001, when marihuana was found in Garner's system when T.S. was

born. Later that same year, the Austin Police Department received a report that Qa. and Qy., who were one and two years old at the time, were seen crossing a busy intersection alone at about 11:30 a.m. Officer Carey Butler responded to the report and found the children being cared for by several concerned adults. One of the neighbors told Butler where the children lived, but when Butler returned the children to their home, Garner was not there. A woman "stopped and said she was [Garner's] sister" and let Butler into the house. A man who identified himself as Quincy Rowe and who said he was a friend of Garner's was in the house and had been sleeping in a back bedroom with T.S.; other testimony showed that Quincy Rowe was not simply a "friend" of Garner's, but instead is her husband and the children's father. Rowe, also known as Quincy Swist, told Butler that the children were supposed to be playing in the living room and must have snuck out of the home while he slept. Rowe said Garner was at the store, but could not say how long she had been gone.

In October 2004, the police were called to Garner's home for a child-endangerment report. Detective William White, who is part of the Austin Police Department's Family Violence Unit, found six-year-old Qy. crying outside of his locked house. Qy. said he could not get in and he did not know where his mother was. White went next door and spoke to Stephen Williams, Garner's neighbor. Williams said he often "kind of watch[ed] out for" Qy., although it was not a formal babysitting arrangement. More than one-half hour later, Qy.'s uncle, named Irvin or Irving,[1] arrived to bring Qy. to Qy.'s grandmother's house. Neither Williams nor Qy.'s uncle knew where Garner was. Qy. and Williams told White that Qy. had been playing at Williams's house when Williams

---

[1] There was testimony referring to Garner's brother as both "Irving" and "Irvin." Williams and Garner called him "Irving," and Garner's mother called him "Irvin."

2

"got onto him" for something. Qy. decided to come home, but found his mother gone and the house locked. Williams told White that he would not have allowed Qy. to return home if he had known Garner was not there and that Garner had not arranged for him to babysit.

Caleb Moore, an investigator with the Department, received a report describing the incident with Qy. Moore attempted to contact Garner, but was unable to locate her or the children. He spoke to Garner's mother, Sylvia Smith, who told him that Garner had moved and that she had not heard from Garner and did not know where Garner was. Smith was unable to walk, but "someone brought her to the door" to speak to Moore.[2] During his investigation, Moore was told by an anonymous caller that the three older children were with a relative in San Antonio and that Qn. was with relatives in Austin. The caller asked Moore not to use her name in anything because she feared reprisals from Garner and her family. Moore removed Qn., leaving a Notice of Removal for Garner, and placed him with his older siblings in San Antonio. Garner called Moore the next day, and he explained the Department's reasons for removing Qn. and asked her to meet him and take a drug test. Garner refused because she had an outstanding warrant and did not want to be arrested.

Garner testified that sometime in October 2004, she placed her children with several of her relatives because she planned to turn herself in to the police and her mother was in the hospital and could not take the children. Garner signed an informal form giving custody of Qy. and T.S. to Cynthia Simmons, who is one of her husband's cousins and who lives in San Antonio. Qa. was initially placed with her great-aunt, and Qn. was placed with Smith; Garner did not know when Qa.

---

[2] Smith testified that in March 2005, she underwent surgery and had a complete hysterectomy. After her surgery, she had an infection and some "follow-up problems" and spent "quite awhile" in the hospital.

went to live with Simmons. The Department then placed all four children in Simmons's care. Since their placement with Simmons, Garner has had limited interaction with her children. At the time of trial, Garner had seen them only once since their removal, and she testified it had been more than a year since she had seen her children and about six months since she had spoken to them on the phone. Garner had also had very little contact with the Department. Despite Department requests, she did not attend the placement hearing in January 2005, nor did she take drug tests as requested by Moore. Garner testified she had not been responsive early in the case because she was in hiding from the police, avoiding an arrest warrant for burglary.

Garner was first arrested for burglary in May 2001 and received ten years' probation. In June 21, 2002, Garner was convicted of giving a false statement to obtain credit and served 90 days in jail. In September 2003, Garner was again arrested for burglary, but she gave the police her cousin's name rather than her own and then evaded the police until June 2005, when she was arrested for a third burglary of a habitation. At the time of the trial, Garner was serving concurrent seven-year sentences for all three burglary charges.[3] Garner testified that if her parental rights were not terminated, she planned to sign the necessary papers to turn her children over to her mother.

While in Garner's care, the children had been through several moves. The two oldest children were frequently absent from school and transferred schools several times, and Garner testified that by the time her oldest child, Qy., was seven, he had attended three or four schools. Rose Marie Baker, Qa.'s kindergarten teacher in San Antonio, testified that when Qa. started in her

---

[3] The children's father, who relinquished his parental rights, was also incarcerated at the time of trial, serving time for murder.

4

class at age six, she functioned at a four-year-old level, which indicated to Baker that Qa. had not attended school on a regular basis. After being evaluated, Qa. qualified for special education. Qa. was also interviewed by Bexar County forensic interviewer, Mary Eileen Floyd, in January 2005, and during the interview, Qa. made an outcry that she had been sexually abused by men named James and Irving while in Garner's care.[4] Floyd testified after her interview with Qa., she felt comfortable that Qa. could differentiate between the truth and a lie.

Dr. Jimenez, a family psychiatrist who has been treating all four children since March 2005, testified that the children continue to see him every two to three weeks. He testified that the children had grown up in "an unbelievably pathological" and "[a]bsolutely horrifying" environment. When the children were first referred to Dr. Jimenez, the Department informed him that Qa. had an anger problem, would masturbate in public, was highly distracted and impulsive, and would kiss anyone, even strangers, on the lips, neck, and ears; Qy., who was seven at the beginning of his treatment, did not interact with others, was very fidgety and hyper, and continually cried for his "daddy"; and T.S. and Qn. exhibited similar behaviors—inattentiveness and fidgeting, nightmares, soiling and wetting themselves, irritability and rage, and long periods of sadness.

Dr. Jimenez has diagnosed Qa. with bipolar depression, attention deficit hyperactive disorder ("ADHD"), and post-traumatic stress disorder. Qa. told Dr. Jimenez that her grandmother's boyfriend molested her, but she will not go into any detail about the abuse. Dr. Jimenez believed that Qa.'s post-traumatic stress disorder is due to molestation and that her behavior indicates she was

---

[4] The children's grandmother, Sylvia Smith, is married to a man named James, and one of Garner's brothers is named Irving or Irvin. However, Floyd did not do an investigation to determine who T.S. was referring to when she said she had been molested by James and Irving.

"sexually abused maliciously over a long span of time and in very horrible ways"; he said "some pretty bad things must have happened and not just fondling." In October and December 2005, Qa. was referred to a psychiatric hospital due to her public masturbation and aggressive behavior and because she told a teacher she wanted to die. Dr. Jimenez testified that those hospital visits helped stabilize Qa., who could then continue treatment while living with Simmons, who is providing Qa. with appropriate care. Dr. Jimenez testified that Qa. told him she was afraid of her mother and grandmother and never wants to see or talk to them again. Qa. is taking mood stabilizers, ADHD medication, and an anti-depressant, and Dr. Jimenez opined that Qa. was the most disturbed of the four children. He was optimistic but guarded about her prospects for recovery and testified that she might need "some other type of programming in the future. But right now, . . . the best place for her is there [with Simmons] and continuing in the school and the treatment that she's getting."

Dr. Jimenez testified that Qy. has major depressive disorder, over-anxious disorder, and ADHD and functions at fifty percent of where he should at his age. Qy. has told Dr. Jimenez that he does not want to live with his mother or grandmother, saying, "I don't like them and I'm scared." Qy. initially wanted desperately to be with his father, but that desire has "waned a great deal"; Qy. does not know where his father is or what he has done. Dr. Jimenez testified that Qy. says that he is happy now that he lives with Simmons and that he loves his school, loves Simmons, and does not wish to leave. He worries that he might have to leave Simmons's care, but will not speak about his concerns in any detail. Dr. Jimenez also testified that Qy.'s teachers have said he is doing much better in school and that Qy. is making progress physically, gaining weight and eating properly.

6

Dr. Jimenez testified that T.S. has also told him she does not want to return to her mother or grandmother, and insists on calling Simmons her mother. T.S. has been diagnosed as suffering from bipolar disorder, ADHD, post-traumatic stress disorder, encopresis, and enuresis, and she takes medications for ADHD and bipolar disorder. Dr. Jimenez testified that T.S. exhibited rage, long periods of sadness, fidgety behavior, and inappropriate kissing and fondling with Qa. Dr. Jimenez testified that his diagnosis of Qn. mirrors that of T.S. and that Qn. refers to Simmons as "mommy." Dr. Jimenez testified that early in his treatment of Qn., if he mentioned Qn.'s "home situation with his biological mother and grandmother, he start[ed] screaming, I mean, screaming where you could hear him a block away, and he [would] not stop." He testified that this behavior showed that Qn. was "terrorized, and I mean, that's—that's absolutely abnormal."

Dr. Jimenez testified that he had seen dramatic improvement in all four children since he started treating them a year before. He testified that the children are happier, their social skills have improved, their grades are on the rise, and T.S. and Qn.'s encopresis and enuresis is gone. Dr. Jimenez characterized Simmons as a "saint" and praised her ability to empathize with the children. He testified that Simmons has been very consistent and conscientious about bringing the children to therapy, giving them their medications, and making notes of their behavior for his review. Dr. Jimenez believed that the children's "dramatic changes" showed that it was in their best interests for Garner's rights to be terminated and for them to stay with Simmons, where they have a stable home and school that they love and a family that is consistent, loyal, and putting their welfare first.

Department caseworker Cory Jones testified that he visits the children monthly. He said that the children were doing well with Simmons and were forming strong bonds with her and

7

her three children, who are much older. Jones testified that the children were very comfortable in Simmons's home and called Simmons "mommy." Jones believed termination of Garner's rights was in the children's best interest. She also testified that an adoptive home study had been completed on Simmons and that Simmons had been approved to adopt the children. A similar home study was not completed on Smith, the maternal grandmother, despite requests from Garner and Smith. Jones explained that the Department had doubts about Smith as an appropriate placement for the children because the alleged abuse of Qa. occurred in Smith's home, Smith has a past history of referrals with the Department, and the Department is concerned that Smith, who exhibited a general sense of denial about the children's problems, would not be able to meet their therapeutic needs.

Simmons testified about the improvement she had seen in all four children and that she planned to adopt them if Garner's rights were terminated. She testified that she was a foster child herself, that she has vertigo and is disabled as a result, and that she went through depression and dealt with a learning disability growing up. She testified that despite those problems, she was now fine. She had been off of medications for two years and no longer needed psychiatric care.

Tanya Swist, Garner's sister-in-law, testified that she approved of the manner in which Garner raised her children. Further, although she was not worried about the children being in Simmons's care, she was concerned that Simmons's disability could affect her capacity to raise the children. She felt the appropriate placement for the children was with Smith, their grandmother. June Smith, who had been Smith's boss at various daycare centers, also testified that Smith was a good placement for the children. She testified that Smith, who has an associate's degree in early childhood, was an excellent employee and interacted well with children. Moreover, she stated that

8

she allowed her own children, one of whom has special needs, to spend time at Smith's home. Jacqueline Teeler, assistant principal at Decker Elementary and Smith's current boss, testified that she hired Smith to work with children with special needs at the elementary school. Teeler described Smith as nurturing and calm with the children in her classroom. Reverend Evelyn Patterson met Smith ten to twelve years ago at church, where Smith acted as director of the youth ministry, and testified that she saw Smith taking good care of her grandchildren while at church.

Smith, who is forty-eight years old, testified that the investigation into whether her husband James had sexually abused Qa. was still ongoing. She did not believe her husband had abused Qa. and said that "another James" was "the grandchildren's grandfather," but said that if she ever learned her husband had hurt Qa., she would turn him in. She testified about her education in child development and her work as a teacher and about Garner's troubled background. Smith testified that she had seven children and that five of them have been incarcerated. She testified that in March 2004, she underwent surgery and was not able to take care of the children at that time.

### Jury Charge

In her first issue on appeal, Garner asserts that the trial court erred in failing to allow a post-termination question in the jury charge regarding the appointment of her mother, Smith, as the managing conservator of the children. The only questions submitted to the jury were (1) whether Garner's parental rights to her children should be terminated and, if not, (2) whether Garner should be appointed managing conservator. The jury answered the first question in the affirmative and did not reach the second. Garner argues that under section 105.002 of the family code, which provides

9

that "a party is entitled to a verdict by the jury . . . on the issues of the appointment of a sole managing conservator," the jury should have been allowed to consider her mother as a possible managing conservator for the children in the event her rights were terminated. Tex. Fam. Code Ann. § 105.002(c)(1) (West Supp. 2006). The Department contends that Garner did not preserve this argument because she did not make this specific request before the trial court.

A complaint to the jury charge is waived unless specifically included in an objection. Tex. R. Civ. P. 274; Tex. R. App. P. 33.1(a)(1) (record must demonstrate that complaint was made to trial court by timely request, objection, or motion that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint"). An objection is specific if it "enables the trial court to understand the precise grounds so as to make an informed ruling." *McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 74 (Tex. 1989). Although there are heightened procedural protections in termination cases, as a general rule, due process does not mandate that appellate courts review unpreserved complaints in such cases. *In re B.L.D.*, 113 S.W.3d 340, 354 (Tex. 2003).

Garner did not specify her complaint before the trial court and thus did not allow the trial court to make an informed ruling on the issue. On appeal, she complains that the jury did not have the opportunity to consider her mother as managing conservator in the event Garner's parental rights were terminated. However, the record shows that Garner's request to the trial court was that the jury consider her mother for managing conservatorship if Garner *maintained* her parental rights.

Garner's pleadings asked that she be named managing conservator, or, in the alternative, that she be named possessory conservator and that Smith be named managing

10

conservator; "[s]trictly in the alternative," if she were named neither managing nor possessory conservator, Garner asked that Smith be granted possession of the children. Smith did not file any pleadings that could be construed as seeking to intervene or to be named managing conservator.

At the pre-trial hearing, counsel for Garner stated:

I have pled in my pleadings under 105.002 that a jury be allowed to make a determination about conservatorship, and so in my pleadings I've asked for the jury to, *if they do not terminate the mother's rights, to either be able to consider placing them with the mother or with the grandmother*.

(Emphasis added.) She went on to say:

*I think it's very clear that when there's termination, you can't ask for any access or conservatorship after termination*. But I think that the Legislature has made that really clear that you can't do that if there's a termination. But if there's no termination, then I believe that the jury has a right to make that decision about the conservatorship. And that's the way I've set up my pleadings, that's the way the jury charge is set up and my recommendations. *And only if the mom's rights are not terminated, then the jury should have the right to make the decision about the conservatorship of the children*.

(Emphasis added.) Likewise, Garner's testimony focused on her plans to place her children with her mother if her parental rights were not terminated. During the charge conference, Garner's counsel requested a jury question offering Smith as managing conservator, but did not specify whether the jury should be able to consider Smith if Garner's rights were terminated or only if they were maintained. In Garner's motion for a new trial, she complained in her recitation of the facts that the jury was not asked to consider whether to name Smith "as the Permanent Managing Conservator if the jury did not terminate the rights of Tonya Garner," and in her argument, she asserted that the

11

"jury should have been permitted to consider whether [Garner's] rights could have been preserved while allowing [Smith] to be considered as the Permanent Managing Conservator."

Finally, we note that during its pre-trial hearing, the trial court raised concerns that Smith had not intervened in the proceeding. The court said:

> Here's the way I think that works. A person—a party in the case can ask for conservatorship—can ask to be appointed managing conservator. . . . However, I don't think that a party can ask the jury to appoint someone else who has not made that request as managing conservator. I think the person who wants that—those powers, rights and duties has to make the request.

Garner replied that section 105.002 places the decision of managing conservatorship with the jury, and the court reiterated its understanding that "the fact that the jury . . . can make a decision on conservatorship does not change standing or pleading rules and intervention rules. . . . A party can ask to be appointed conservator, but I don't think a party can ask that someone else be appointed conservator in their stead." The Department and the children's attorney ad litem both agreed with the trial court, stating that they believed a grandparent had to intervene to be named managing conservator. Garner's attorney argued that such a rule would bar a grandparent from being named conservator if he or she could not afford to intervene in a suit, but the attorney ad litem noted, "[T]he burden to intervene is so light. If nobody files an objection, you're in the case. It's not a heavy burden." Despite the court's statement that someone who does not request conservatorship may not

be appointed conservator, Smith was never asked during her testimony whether she even wished to be named managing conservator, with its attendant tremendous responsibilities.[5]

Garner's complaint on appeal is that the jury was not asked to consider Smith as managing conservator if the jury terminated her rights, but her arguments before the trial court asserted only that the jury should be able to consider Smith as a possible managing conservator in the event that Garner's rights were not terminated. The jury question to which Garner now asserts she was entitled was never requested or argued before the trial court. As a consequence, the court never had the opportunity to rule on her appellate complaint, and there is nothing to review. *See* Tex. R. App. P. 33.1. We overrule Garner's first issue on appeal.

**Sufficiency of the Evidence**

Garner's second and third issues on appeal are that the evidence is legally insufficient to support the jury's findings that the statutory grounds for termination were met and that termination was in the best interests of the children. A trial court may terminate a parent's rights to their children

---

[5] During Smith's testimony, she said she would "do a good job taking care of" the children and named the schools the children would attend if they were living with her. She also testified that she herself attended hearings because she wanted to be involved with the children, that she had called the Department "to request information and to talk to them about visitation," and that Garner had written a letter asking that the children be placed with Smith. The closest Smith ever came to testifying explicitly that she wanted to be named managing conservator was when she was asked, "If the children were to be placed with you by your daughter at the end of this proceeding, what would you do in terms of dealing with their medical needs," to which she responded she would see that their medical needs were met. She was further asked what she would do to protect the children if Garner was "not settling down in her life, doing the right things," and she testified that she would not allow Garner around the children "until she got herself together." She testified that if Garner "were to place them with" Smith, she would raise them until they were adults. She also expressed concern that the children were over-medicated and said she would seek a second opinion.

13

only if it finds (1) that the parent has engaged in conduct set out as statutory grounds for termination, and (2) termination is in the children's best interests. Tex. Fam. Code Ann. § 161.001 (West. Supp. 2006); *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). The Department must establish these elements by clear and convincing evidence, Tex. Fam. Code Ann. § 161.001, which is the level of evidence that "'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations'" supporting the termination. *C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

Having reviewed the evidence, we hold that the Department presented clear and convincing evidence of both elements. We have set out a detailed summary of the evidence, which shows that Garner's behavior endangered the children's well-being (*i.e.*, leaving them in circumstances that allowed her one- and two-year-old children to cross a busy intersection alone; leaving the home and locking out her six-year-old son; alleged sexual abuse; and testimony about the children's nightmares and fear of their mother and grandmother) and that the termination of her rights is in the best interest of the children (*i.e.*, Dr. Jimenez's and the other Department-witnesses' testimony about the trauma the children have endured and the improvement in their mental health and behavior since their removal). Although Garner presented evidence in an attempt to rebut the Department's allegations of neglect, it was for the jury to consider and resolve the evidentiary conflicts. As long as reasonable jurors could differ in their conclusions, we may not and will not re-weigh the evidence or second-guess the jury's determinations. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-22 (Tex. 2005). We overrule Garner's second and third issues on appeal.

## Conclusion

Having overruled Garner's issues, we affirm the trial court's termination decree.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   June 14, 2007

15